# UNION NATIONAL BANK OF KANSAS CITY v. CHARLES LYONS, Receiver of MIDDLETON BANK, Appellant.

### In Banc, May 22, 1909.*

1. **ASSUMPSIT: Suit on Note: No Motion to Elect.** A petition which alleges that defendant borrowed ten thousand dollars from plaintiff and gave its note therefor, and at its maturity, in renewal thereof, for value received, gave another note for the same amount, and declares that said last note is attached to the petition and therewith filed, and then alleges that no part of said sum so borrowed, and no part of said note, has ever been paid and by reason of the premises defendant now owes and stands indebted to plaintiff in said sum, with interest thereon from the note's maturity at eight per cent per annum, states two causes of action in one count, namely, one on the note and the other in assumpsit for the money loaned; and defendant having filed no motion to elect, it can not on its appeal complain that plaintiff of its own motion has elected to stand upon the cause in assumpsit.

   *Held*, by GRAVES, J., dissenting, that the petition counts upon the note, and not in assumpsit for money loaned, and that the allegations in reference to renewals were made to connect the false assurance of the cashier that the first note was made with the consent of the directors with each renewal; and that plaintiff having tried its case on the theory that it was a suit on the note and first argued the case on that theory here, ought to be held to that theory, and not be permitted to now change front, and recover as in assumpsit for money loaned.

2. **MONEY BORROWED BY BANK: General Denial: Striking Out Special Plea.** The charge in the petition that defendant borrowed the money from plaintiff is put squarely in issue by a general denial, and under it defendant can show that it as the borrowing bank was not authorized by its board of directors to borrow the money, and if that was a legal defense the court did not err in striking out from the answer that part thereof which alleged that the board of directors did not, by written record or otherwise, authorize any of its officers to borrow said money.

*Note.—Decided in Division One, March 31, 1909; transferred to Court in Banc and divisional opinion adopted May 22, 1909. GRAVES, J., dissenting.

3. ———: No Written Authority From Board: Sec. 1294, R. S. 1899. Sec. 1294, R. S. 1899, providing that "the cashier or other employee shall have no power to indorse, sell, pledge or hypothecate any notes, bonds or other obligations received by such corporation for money loaned, until such power and authority shall have been given such cashier or employee by its board of directors, in a regular meeting of the board, a written record of which proceeding shall first have been made," does not prohibit the cashier of a bank from borrowing money and executing the bank's note therefor without such written authority. That section refers to notes executed by others received by the bank, and not to its own notes executed to others.

4. ———: ———: ———: Collateral as Security. And where the cashier, at the time he borrowed in the name of the bank the ten thousand dollars sued for, indorsed and hypothecated another note for $12,500 owned by the bank, that act, if illegal, because unauthorized by the board of directors, would not be a defense in the suit against the bank by the lender for the ten thousand dollars borrowed. That hypothecation only rendered the collateral security unavailing, and did not invalidate the loan contract.

5. ———: ———: Sec. 1281: By Cashier Alone: Loan Valid Nevertheless: Assumpsit. Section 1281, R. S. 1899, saying that "no bills payable shall be made and no bills shall be rediscounted by the bank except with the consent of the board of directors," gives the cashier no authority to execute a note in the name of the bank without the consent of the board, and a note so executed by him is invalid. But a bank has the power to borrow money without executing any written obligation therefor; and if, upon the execution of a note by the cashier in the name of the bank, the bank received the amount of money named therein, and is sued therefor in assumpsit, it is liable for the money. The bank may repudiate the note, but when it received the money it did so under an implied contract to repay it, and will be compelled to refund it, with legal interest.

Held, by GRAVES, J., dissenting, that Secs. 1294 and 1281, R. S. 1899, were enacted to prevent a cashier from looting a bank by borrowing money, and that they make null and void any note given by him in the bank's name without the consent of the board of directors, and it is trifling with the meaning and purpose of the statute to say he can in the name of the bank borrow money without a note and bind the bank to refund it, and can not borrow money with a note—the usual and customary way of procuring money by way of a loan being by giving a bill payable. The purpose of the statute was to prohibit the cashier from borrowing money in the name of the bank except upon the consent of the directors, by note or otherwise, and that prohibition was intended to protect not only the bank but its depositors.

6. **ULTRA VIRES CONTRACT: Money Loaned: Invalid Note: Duty to Refund: Implied Agreement.** Where a void contract has been entered into, by means of which money or other valuable thing has been parted with by one party thereto and received and accepted by the other party, and the latter repudiates the contract and refuses to refund the money or other valuable thing, the law will imply an agreement on the part of the recipient to return the same to the other party; and if he refuses to refund, the injured party may maintain an appropriate action against the recipient for the recovery of the money, or for the value of the other property so retained, unless the enforcement of the implied agreement would violate some statute which prohibits the doing of the very thing the enforcement of the agreement would accomplish. The law, unless impeded by the positive statute, will not take the money or property of one person and give it to another without just compensation, and against the intention of the parties, as manifested by their contract. [Distinguishing Seaman v. Cap-au-Gris Levee District, 219 Mo. 1.]

7. **EVIDENCE: Secondary: Books and Drafts of Bank: No Objection.** Unless the appellant at the trial objected to the bank's vice-president testifying that the proceeds of the note given by appellant bank were placed on the bank books to appellant's credit and drawn out by it upon drafts, it cannot be heard to contend on appeal that the books and drafts were themselves the best evidence, and therefore the vice-president's testimoney was secondary and incompetent. The objection not having been timely made in the trial court will be considered waived on appeal.

8. **————: Parol Testimony As to Contents of Bank Drafts and Books: Not Secondary.** The parol testimony of the vice-president of the plaintiff bank that the proceeds of the note evidencing the loan to defendant bank were placed to the defendant's credit on the bank's books and drawn out on drafts by defendant, is admissible evidence, in a suit to recover the amount of the loan. The books and drafts do not stand on the same footing with written contracts signed by the parties, but if produced in evidence they can be corroborated, explained, or contradicted by parol testimony, and their introduction does not exclude the parol testimony.

*Held,* by GRAVES, J., while not dissenting from the competency of the testimony, that there was not sufficient proof that the defunct bank ever received the money. Oral testimony that the proceeds of the note were credited to the defunct bank and drawn out by drafts drawn by the cashier is not sufficient proof that the money ever reached the defunct bank.

9. **JUDGMENT: Against Receiver: In Assumpsit.** In an assumpsit for money loaned against the receiver of an insolvent bank the judgment should not direct execution to be "levied out of the assets in the hands of the receiver;" but the plaintiff stands upon an equal footing with other creditors, and the judgment should be prorated.

Appeal from Cooper Circuit Court.—*Hon. Wm. H. Martin,* Judge.

REVERSED AND REMANDED (*with directions*).

*C. D. Corum, Chas. Lyons* and *Wm. H. Chiles* for appellant.

(1) The court erred in striking out that part of appellant's answer setting up want of authority and non-compliance with the statutory requisites in the execution of the note sued upon. Sec. 1294, R. S. 1899. We do not know that this court has been called upon to construe this statute, but it has been passed by both Courts of Appeals. When first presented in the case of Hume v. Eagon, 73 Mo. App. 271, the acts of the cashier done in contravention of the statute were decided to be voidable only and capable of ratification, but when the same case came back a second time, the court properly held, as the statute expressly states, that such acts are null and void and without any force or validity whatever. Hume v. Eagon, 83 Mo. App. 576. The same conclusion is reached in Vansandt v. Hobbs, 84 Mo. App. 628; Powers v. Woolfolk, 3 S. W. 1187. (2) For the same reasons and by virtue of the same law and decisions quoted in point I, the court erred in admitting the note in evidence on behalf of respondent. (3) The same question (with others) arises under appellant's demurrer to the evidence, which the court erroneously overruled. There are cases which hold that a party cannot ques-

tion the validity of an act done without authority, without restoring the money or property received under such act. The law is however not applicable to this case for the reasons: (a) There is no evidence that the Middleton Bank received any money upon the note sued upon, nor upon the two notes previously given. Mr. Neal testified that the proceeds of the note of May, 1904, less the interest, was placed to the credit of the Middleton Bank on the books of the respondent bank, without showing such books even or other evidence of such transaction. He further testified (also by verbal and secondary evidence) that the Middleton Bank drew upon its account with the respondent bank and made further deposits on that account, which he says was the usual course of business between the town and city banks, so that without the production of that account, or the drafts which respondent claims were drawn upon it, it is impossible to say that the Middleton Bank drew from the respondent bank the alleged proceeds of the $10,000 note. (b) But in addition to lack of proof, the law upon which the respondent will rely is not applicable to this case. In those cases the party for whom the equitable rule was invoked was either an innocent party or both stood *in pari delicto*. In this case the Middleton Bank is the innocent party and without any notice of the transaction in question, while the respondent entered into the matter with full knowledge of the law and in direct violation of it. This is shown by the letter accompanying the first note of May, 1904, referring to the "copy of the minutes and resolutions, as instructed by you," which are non-existent, and makes the respondent bank a guilty violator of the law with full knowledge and therefore not entitled to the benefit of the equitable rule. But the principle involved in this line of cases is the broad one thoroughly established, that a contract made in violation of a statute is void.

The courts, however, have at times made a distinction among cases where there was (1) a simple prohibition of the act, (2) an act for whose violation a penalty was prescribed, and (3) an act done, expressly declared in the statute to be null and void. This case comes under a statute of the third class, and the courts have no alternative than to enforce the plain language of the Legislature. So that in this case the acts of the cashier in pledging, hypothecating, etc., are declared to be "null and void" and the law cannot be evaded, denied or explained away. The Legislature has so declared, for a wise reason, the propriety and necessity of which become more insistent day by day, in our experience with bank looting and defalcations. So the courts of this State now hold that in cases of the violation of an express statute in language as strong as this no action can be maintained either at law or in equity. Live Stock Assn. Co. v. Land & C. Co., 138 Mo. 394; Tri-State Co. v. Forest Park Co., 192 Mo. 404; Ullman v. Fair Assn., 167 Mo. 273; St. Louis Fair Co. v. Carmody, 151 Mo. 566; Sawyer v. Sanderson, 113 Mo. App. 244; Sprague v. Rooney, 104 Mo. 358. To the same effect is the case of Haggerty v. St. Louis Ice Co., 143 Mo. 238. (4) The court erred in permitting respondent to prove by the oral testimony of witness Neal the alleged loan of $10,000, when it should have been evidenced, and could have been, under the circumstances, evidenced by writing only.

*W. M. Williams* and *Warner, Dean, McLeod & Timmonds* for respondent.

(1) The Middleton Bank had power to borrow money. Ringling v. Kohn, 6 Mo. App. 333; Donnell v. Bank, 80 Mo. 165; Anten v. Bank, 174 U. S. 125;

Aldrich v. Bank, 176 U. S. 627. (2) Since the bank had power to borrow, that power could be exercised by its cashier, by virtue of his office. Ringling v. Kohn, 6 Mo. App. 333; Donnell v. Bank, 80 Mo. 165; Savings Bank v. Hughes, 62 Mo. App. 576; Bank v. Dick, 73 Mo. App. 354; First Nat. Bank v. Arnold (Ind.), 60 N. E. 134; Anten v. Bank, 174 U. S. 125; Aldrich v. Bank, 176 U. S. 627; Coats v. Donnell, 94 N. Y. 168; Morse on Banks and Banking (4 Ed.), sec. 160. (3) Where a loan is made in good faith, the loaning bank is not bound to follow the money to see that it was applied to corporate purposes. If the officers of the borrowing bank misapply the money, the borrowing bank cannot, for that reason, defeat the loaning bank's right of recovery. Ringling v. Kohn, 6 Mo. App. 333; Donnell v. Bank, 80 Mo. 165; First Nat. Bank v. Arnold (Ind.), 60 N. E. 134; Anten v. Bank, 174 U. S. 125; Aldrich v. Bank, 176 U. S. 618. (4) As it was competent for the board of directors to authorize the cashier to borrow money, the Union National was justified in assuming that the dealings of the cashier were authorized, and that they were executed as authorized. Anten v. Bank, 174 U. S. 148. (5) Section 1294, Revised Statutes of 1899, has no bearing upon this case. This suit is not to enforce any right to or lien upon any of the assets of the Middleton Bank indorsed, sold, pledged or hypothecated by the cashier of said bank, or any employee thereof. Plaintiff does not seek to hold any bonds, bills, notes or securities of any kind, pledged or hypothecated by any official of said bank, with or without the consent of the board of directors. (6) Section 1281 is inapplicable. It does not prohibit a bank from borrowing money. (7) Plaintiff was entitled to recover against the defendant as for money loaned to the Middleton Bank, even if it should be held that the cashier had no authority to execute notes for said indebtedness. Bank of Missouri v. Scott, 1 Mo. 745;

Binion v. Browning, 26 Mo. 270; Marston v. Boynton, 47 Mass. 127; Badart v. Foulon, 31 Atl. 515. (8) "One who makes a loan and accepts a note as evidence thereof, may disregard the note and sue for money loaned." Schreyer v. Turner Flouring Mills Co., 43 Pac. 719; Pauly v. Pauly, 40 Pac. 29. (9) "The power of the bank to make such a contract of loan without taking any written evidence of indebtedness was unquestionable." Vanatta v. State Bank of Ohio, 9 Ohio St. 34. (10) The lender may recover the amount of his loan, even though the notes taken for the indebtedness are unauthorized and void, and this, too, although the form of the security taken is prohibited by statute. Vanatta v. State Bank of Ohio, 9 Ohio St. 34; Pauly v. Pauly, 40 Pac. 29; Schreyer v. Turner Flouring Mills Co., 43 Pac. 719. (11) The notes, even if not evidence of liability on the express contract appearing on the face thereof, "are admissible to show that the money which they represent was furnished by the plaintiff." Pauly v. Pauly, 40 Pac. 29.

## IN BANC.

PER CURIAM.—This cause was transferred to Court in Banc upon the dissent of GRAVES, J., and upon reargument and after due consideration the opinion of WOODSON, J., in division is adopted as the opinion of the court.

All concur except GRAVES, J., who dissents in a separate opinion.

## IN DIVISION ONE.

WOODSON, J.—This suit was instituted by plaintiff in the circuit court of Lafayette county, against the defendant, to recover the sum of $10,000 loaned

220 Sup—35

by it to defendant. The trial resulted in a verdict and judgment for plaintiff for the sum of $10,560, principal and interest. The circuit court having refused a new trial, the defendant duly appealed the cause to this court.

Formal matters omitted, the petition on which the cause was tried was as follows:

"For its amended petition herein, the above-named plaintiff alleges that it is now, and at all the dates hereinafter mentioned was, a national banking corporation, organized and existing under and by virtue of the laws of the United States, and engaged in the general banking business in Kansas City, Missouri. That said Middleton Bank is now and at all the times hereinafter mentioned was a banking corporation organized and existing under and by virtue of the laws of the State of Missouri, and until the appointment of the receiver as hereinafter set forth, engaged in a general banking business at Waverly, Missouri. That on the 6th day of May, 1905, defendant, Charles Lyons, was by the circuit court of Lafayette county duly appointed receiver of and for said Middleton Bank to take possession of its property and assets and for the purpose of winding up the business thereof, and is now in possession of said property and assets as such receiver for that purpose. That by order of said circuit court of Lafayette county made on the 22d day of June, 1905, this plaintiff was given permission to institute and prosecute this suit.

"Plaintiff further states that on the 7th day of May, 1904, said Middleton Bank borrowed of plaintiff ten thousand dollars, which sum was loaned by plaintiff to said Middleton Bank, and thereupon said Middleton Bank executed and delivered to plaintiff its promissory note, dated May 7, 1904, whereby it promised, for value received, to pay to plaintiff or order said sum of ten thousand dollars, one hundred and twenty days after date, with interest thereon from

maturity at the rate of eight per cent per annum. That upon the maturity of said note, said Middleton Bank, in renewal thereof, executed and delivered to plaintiff another promissory note, dated September 6, 1904, whereby it promised, for value received, to pay to plaintiff or order, said sum of ten thousand dollars, one hundred and twenty days after date, with interest thereon from maturity at the rate of eight per cent per annum; and thereupon plaintiff cancelled and delivered up to said Middleton Bank the note first above-mentioned. That upon the maturity of said note, dated September 6, 1904, said Middleton Bank, in renewal thereof, executed and delivered to plaintiff another promissory note, dated January 9, 1905, whereby it promised, for value received, to pay to plaintiff or order said sum of ten thousand dollars, one hundred and twenty days after date, with interest thereon from maturity at the rate of eight per cent per annum, a duly verified copy of which last-mentioned note is hereto attached and herewith filed, marked 'Exhibit A.' Plaintiff further says that no part of said sum of ten thousand dollars so borrowed as aforesaid, and no part of said note, has ever been paid, and by reason of the premises, said Middleton Bank now owes and stands indebted to plaintiff in the sum of ten thousand dollars, together with interest thereon from May 12, 1905, at the rate of eight per cent per annum; for which sum and for costs plaintiff prays judgment.''

The answer was as follows:

''The defendant for answer to the amended petition of plaintiff admits that plaintiff was and is a national banking corporation under the laws of the United States and engaged in banking at Kansas City, Missouri. Admits that the Middleton Bank was, at the times mentioned, a banking organization organized under and by virtue of the laws of the State of Missouri, and until the appointment of the receiver was engaged in the general banking business at Waverly,

Missouri; admits that on May 6, 1905, defendant, Charles Lyons, was duly appointed receiver for said Middleton Bank by the circuit court of Lafayette county, Missouri, and is now in the possession of the property and assets of said bank as such receiver; admits that by order of said circuit court of Lafayette county, Missouri, made on the 22d of June, 1905, plaintiff was given permission to institute and prosecute this suit, and denies each and every other allegation of said amended petition.

"(Defendant further alleges that said Middleton Bank by its board of directors, or otherwise, did not at a regular meeting of said board of directors, by a written record first made, authorize any of its officers to borrow the said sum of ten thousand dollars or any other amount on behalf of said bank, or authorize the execution of any note or obligation therefor, nor did said bank by its said board of directors, at a regular meeting, by a written record or otherwise, authorize any renewal of said alleged note) and now having fully answered asks to be hence discharged with his costs."

Plaintiff filed a motion to strike out the last paragraph of the answer, which alleged that the board of directors of the Middleton Bank did not authorize its officers to borrow the money sued for, or to execute the note mentioned in the pleadings. This motion was by the court sustained, and defendant duly excepted.

The facts are few and practically undisputed, and are as follows:

E. H. Lewis was cashier of the Middleton Bank (which will hereafter be called the defendant or appellant) from 1899 to the time of its failure. Lewis, as such, borrowed the $10,000 in question, signed the note given therefor and all of the renewals thereof, including the last.

The defendant had been the correspondent of plaintiff from the year 1893 to the date of its failure,

and kept a running account with the latter during said time, making deposits and drawing drafts against them, according to the usual course of business. At the time of the loan, Lewis wrote plaintiff a letter inclosing the note and collaterals, and requested that the proceeds of the note, less the discount, be placed to the credit of defendant, which was done, and the latter was duly notified thereof. Defendant drew this money from plaintiff by drafts in the usual course of business; and no part of the $10,000 has ever been paid. The note, a copy of which was filed with the petition, was admitted in evidence over the objection of defendant.

At the close of plaintiff's case, defendant asked a demurrer to the evidence, which was by the court refused, and defendant duly excepted.

Defendant introduced no testimony.

The only instruction given by the court was as to the measure of recovery, if the verdict should be for the plaintiff. The jury were told that if they should find the issues for the plaintiff, they should allow it such sum as they might believe from the evidence was loaned by the plaintiff, if any, to the Middleton Bank, together with interest from the date of the institution of the suit to the time of the trial, at the rate of six per cent per annum.

The jury returned a verdict for the plaintiff for $10,560, and a judgment was rendered by the court for that amount against the defendant as receiver, and to be paid out of the assets of the Middleton Bank in his hands as such receiver, and for the costs. Defendant, in due time, filed a motion for a new trial and in arrest of judgment, which, being overruled, he has brought the case to this court by appeal, as before stated.

## OPINION.

I.    The character of this suit is the first proposition presented for determination.    Respondent contends that it is a suit in assumpsit to recover money loaned by it to the appellant; while, upon the other hand, appellant insists that it is a suit on the note attached to the petition.

There is much room for argument in favor of each of those contentions; but when the entire petition is read and its meaning gathered from its four corners, it is apparent the pleader attempted to do more than simply declare upon the note.    If the pleader had intended to declare upon the note, then the following allegations of the petition would have been superfluous and entirely unnecessary, to-wit: the history of the various renewals of the note originally executed; the allegation that the defendant borrowed of plaintiff ten thousand dollars on May 7, 1904; that no part of said sum of ten thousand dollars so borrowed had ever been paid; and that by reason of the premises the defendant now owes and stands indebted to the plaintiff in the sum of ten thousand dollars; but the pleader would have stated in conventional form that on January 9, 1905, the defendant, by its promissory note, for value received, promised to pay plaintiff the sum of ten thousand dollars with interest, etc., one hundred and twenty days after date; that said note was past due and unpaid, and prayed judgment, etc.    But, as before stated, when we read the entire petition we are convinced that the pleader had in mind and was trying to plead the facts of the transaction in detail just as they occurred, and trusted to the courts to name the form of action to which it belongs.

By a critical analysis of the allegations of the petition it will be seen that it is dual in character, that is, it states two perfect causes of action in one count—one upon the note and the other in assumpsit

for the money loaned. If appellant had seen proper, it could have filed its motion asking the court to compel respondent to elect upon which of the two causes of action stated it would go to trial. [White v. Railroad, 202 Mo. 1. c. 561; O'Brien v. Railroad, 212 Mo. 1. c. 69.] But having neglected to file such a motion, appellant is in no position now to complain of the fact that respondent of its own motion elected to stand upon the count in assumpsit.

The case was tried upon the latter theory, and appellant cannot raise that objection for the first time in this court. If such practice should be tolerated, and had respondent elected to stand upon the note, then appellant could for the same reason have raised the same objection to that election that it now urges against the present election.

Clearly, no court would be justified in permitting such practice to prevail.

We must, therefore, sustain respondent's contention, and hold this is a suit in assumpsit for money loaned.

II. This brings us to the action of the court in striking out that part of the answer which alleged that the board of directors of appellant bank did not authorize Lewis, its cashier, to borrow the money sued for, or to execute the note given therefor. If either of those allegations constituted a defense to the suit, then appellant is not injured by the action of the court in striking out that part of the answer, for the reason that the same facts could have been proven under the general denial filed in the cause. It is self-evident that if the cashier had no power to borrow the money or to execute the note for appellant, then clearly the bank never borrowed the money or executed the note through the cashier. And the charge in the petition that appellant did borrow the money and execute the note was squarely put in issue by the general denial;

and that being true, the court properly sustained the motion to strike out the part of the answer before mentioned.

III. Having in the previous paragraph hereof disposed only of the question of pleading, we now come to the consideration of the merits of that part of the answer which was stricken out by the court, but which we held could be proven under the general denial. That part of the answer is as follows: "Defendant further alleges that said Middleton Bank by its board of directors, or otherwise, did not at a regular meeting of said board of directors, by a written record first made, authorize any of its officers to borrow the said sum of ten thousand dollars, or any other amount, on behalf of said bank, or authorize the execution of any note or obligation therefor; nor did said bank, by its board of directors at a regular meeting, by a written record or otherwise, authorize any renewal of said alleged note, and now having fully answered," etc.

Counsel for appellant insists that under sections 1281 and 1294, Revised Statutes 1899, the cashier of defendant had no authority to borrow the money sued for, or to execute the note mentioned in the pleadings, for the reason that he was not first authorized by written authority to so do by the board of directors. We will consider those two sections of the statute separately, and in the inverse order in which they are stated.

Section 1294, in so far as is material to the question in hand, reads as follows: "The cashier or any other employee shall have no power to indorse, sell, pledge or hypothecate any notes, bonds or other obligations received by said corporation for money loaned, until such power and authority shall have been given such cashier or employee by its board of directors, in a regular meeting of the board, a written record of which proceeding shall first have been made."

There is no pretense that such written authority was given to the cashier to borrow the ten thousand dollars in suit, or to execute the note in question.

While the prohibition enjoined against the cashier to do the things mentioned in the statute is not absolute, yet his power to do those things is conditioned upon the board's written authority first spread of record empowering him to do so; and as his power to do those things depends upon a condition precedent, which is prescribed by a public statute, all the world must take notice of that limitation of his power and authority and determine at their own peril whether or not the condition has been complied with and the authority granted. If not, then his acts are unauthorized, null and void and not binding upon the bank. That being true, it brings us to the question, did that section of the statute prohibit the cashier of defendant bank from borrowing the money and executing the note therefor in question? We think not, for the reason that the statute only prohibits the cashier from *indorsing, selling, pledging or hypothecating* any notes, bonds or other obligations *received* by said bank for money loaned until he is first authorized by the board to do so, etc. The borrowing of the ten thousand dollars in question and the execution of the note therefor by Mr. Lewis, the cashier of the Middleton Bank, was neither the indorsement, sale, pledge or hypothecation of note, bond or other obligation *received* by said bank for *money loaned,* etc. The clear object of the statute was to prevent any of the bank's officers from selling or otherwise disposing of the bank's notes and securities without authority first being granted by the board of directors, and not for the purpose of preventing its officers from borrowing money in the usual course of business.

But counsel for appellant contend that both the Kansas City and St. Louis Courts of Appeals have placed a different construction upon that section of

the statute in the cases of Hume v. Eagon, 83 Mo. App. 576, and Vansandt v. Hobbs, 84 Mo. App. 628. In our judgment that is a misconception of those cases; in each the cashier had sold or disposed of a note owned and held by the bank, and did not borrow money within the meaning of that word, as was done in the case at bar. But there is another feature of this case to which those cases would have applied if the suit had been brought on that phase of the case, and that is this— in addition to borrowing the ten thousand dollars and executing the note in question therefor, the cashier went further and without written authority, first had and obtained from the board of directors, hypothecated a note for the sum of $12,500, owned by the Middleton Bank to the respondent, as collateral security for the $10,000 borrowed from it on May 7, 1904. That hypothecation having been made by the cashier without such authority from the board of directors was clearly in excess of his authority, and was, consequently, null and void. That was the question which was presented to the Kansas City and St. Louis Courts of Appeals in the cases of Hume v. Eagon and Vansandt v. Hobbs, supra.

But conceding the cashier in the case at bar had no authority to hypothecate the $12,500 note to respondent, as collateral security for the $10,000 borrowed of respondent, yet that would not, in the absence of an express statute to the contrary, cut deeper and nullify the contract of loan. It would only render the collateral unavailing. [Vette v. Geist, 155 Mo. 27; Kelerher v. Henderson, 203 Mo. l. c. 516.]

We must, therefore, decide the first contention of appellant against it. But the second presents a much more difficult legal proposition for solution. That is, counsel for appellant contends that under said section 1281 the cashier of the defendant bank had no power to borrow the money in question except with the consent of the board of directors.

So much of that section as is material to this inquiry reads as follows: ''The board of directors of each and every bank organized under this article shall meet at least once per month and pass upon the business of the bank back to the previous meeting of the board, and shall keep a written record of its approval or disapproval of each and every loan, and at each monthly meeting the records shall show the aggregate of the then existing indebtedness and liability of each of the directors and officers to the bank, and no bills payable shall be made and no bills shall be rediscounted by the bank except with the consent of the board of directors.'' The language of that section is plain and unambiguous. It says, no bills *payable shall be made,* and no bills shall be *rediscounted* by the bank without the consent of the board of directors.

While there is some evidence contained in this record which points to the consent of the board to the execution of the bill or note in question, yet it was in our judgment insufficient to warrant the jury or court in finding that such consent was in fact given; and we must, therefore, hold that no such assent was given. This holding brings us to the consideration of the most important legal proposition involved in this litigation.

It is the contention of counsel for respondent that it is entitled to a recovery in this case even though it be conceded that Lewis, the cashier of appellant, had no authority to execute the note in question. This contention is based upon the fact that there is nothing contained in that section of the statute which prevented the Middleton Bank from borrowing the $10,000 in question, but it simply prohibited the bank from executing the note in question therefor.

The power of a bank to borrow money without executing therefor some written form of obligation is unquestionable. [Vanatta v. State Bank of Ohio, 9 Ohio St. 1. c. 34.] The mere fact the cashier of

appellant had no authority to execute the note for the $10,000 borrowed does not render the entire contract illegal and void, and thereby exempt it from repaying the money to the respondent. This suit is not bottomed upon the note, and respondent's success in this case does not depend upon the validity of that instrument. It is sufficient that appellant had the power to borrow the money and that it did in fact borrow it. There was sufficient vitality and force in this transaction to enable appellant to receive the $10,000 from respondent, and now after enjoying the benefits thereof it attempts to repudiate the entire transaction. In so far as this theory of the case is concerned, it is wholly immaterial that appellant's promise was contained in a note which was not executed according to law. If it repudiates the note for the reason that the board of directors had not authorized its execution, then this court would sanction rank injustice to hold that payment of that money need not be made at all. Such is not the law. The bank was not exempt from the common obligation to do justice which binds individuals. Such obligations rest upon all persons whether natural or artificial. If the bank obtained the money and by mistake or without authority of law executed therefor an invalid note, then it was its duty under this general obligation to do justice, to refund it. Under those conditions an implied obligation arose on the part of the appellant to repay the money so obtained. [Sparks v. Jasper County, 213 Mo. l. c. 240.]

A similar question came before the Supreme Court of the United States in the case of Hitchcock v. Galveston, 96 U. S. 341. In that case the city council of Galveston had the authority under the charter to cause sidewalks in the city to be constructed, and in pursuance thereof passed an ordinance ordering the work done, and provided further that the same should be paid for in bonds of the city, which were

also ordered to be issued for that purpose. The contract for doing the work was let to Hitchcock and others, who proceeded to fulfill their engagement. After partially executing the contract the city council declared the contract null and void, and they were forced by the city to abandon the work. The contractors then brought suit to recover the damages sustained by reason of the breach of the contract by the city. The bonds were held to be invalid because their issue was held to be transgressive of the power of the city. The defendant demurred to the petition, which was sustained by the circuit court, and plaintiff sued out a writ of error. In the discussion of this question, on pages 350 and 351, Mr. Justice STRONG, in speaking for the court, used the following language:

"In the view which we shall take of the present case, it is, perhaps, not necessary to inquire whether those cases justify the court's conclusion; for, if it were conceded that the city had no lawful authority to issue the bonds, described in the ordinance and mentioned in the contract, it does not follow that the contract was wholly illegal and void, or that the plaintiffs have no rights under it. They are not suing upon the bonds, and it is not necessary to their success that they should assert the validity of those instruments. It is enough for them that the city council have power to enter into a contract for the improvement of the sidewalks; that such a contract was made with them; that under it they have proceeded to furnish materials and do work, as well as to assume liabilities; that the city has received and now enjoys the benefit of what they have done and furnished; and for these things the city promised to pay; and that after having received the benefit of the contract the city has broken it. It matters not that the promise was to pay in a manner not authorized by law. If payments cannot be made in bonds because their issue is *ultra vires,* it would be

sanctioning rank injustice to hold that payment need not be made at all. Such is not the law. The contract between the parties is in force, so far as it is lawful.

"There may be a difference between the case of an engagement made by a corporation to do an act expressly prohibited by its charter, or some other law, and a case where legislative power to do the act has not been granted. Such a distinction is asserted in some decisions. But the present is not a case in which the issue of the bonds was prohibited by any statute. At most, the issue was unauthorized. At most, there was a defect of power. The promise to give bonds to the plaintiffs in payment of what they undertook to do was, therefore, at farthest, only *ultra vires;* and, in such a case, though specific performance of an engagement to do a thing transgressive of its corporate power may not be enforced, the corporation can be held liable on its contract. Having received benefits at the expense of the other contracting party, it cannot object that it was not empowered to perform what it promised in return, in the mode in which it promised to perform. This was directly ruled in State Board of Agriculture v. Railroad, 47 Ind. 407. There it was held that, 'although there may be a defect of power in a corporation to make a contract, yet if a contract made by it is not in violation of its charter, or of any statute prohibiting it, and the corporation has by its promise induced a party relying on the promise and in execution of the contract to expend money and perform his part thereof, the corporation is liable on the contract.' See, also, substantially to the same effect, Allegheny City v. McClurkan, 14 Pa. St. 81; and, more or less in point, Maher v. Chicago, 38 Ill. 266; Oneida Bank v. Ontario Bank, 21 N. Y. 490; Argenti v. City of San Francisco, 16 Cal. 256; Silver Lake Bank v. North, 4 Johns. (N. Y.) Ch. 370."

The same question came before the Supreme Court
of the United States in the case of Louisiana v. Wood,
102 U. S. 294. That case was brought in the circuit
court of the United States for the eastern district of
Missouri and arose under the laws of this State. The
facts of that case are as follows: The city of Louis-
iana, having lawful power to borrow money and pro-
vide for the payment of her debts, issued her bonds
for the purpose of raising the means with which to
pay her interest-bearing debts and the expenses of her
government. The bonds recited that they were issued
under the authority of the city charter and an ordi-
nance enacted in pursuance thereto on January 8, 1867.
The bonds were not actually executed until July 16,
1872, though antedated as of January 1, 1872, for the
purpose of evading the law of this State, passed March
28, 1872, which provides that no bond thereafter is-
sued, by any county, city, etc., for any purpose what-
ever should be valid or negotiated until it is registered
by the State Auditor, etc. The bonds were sold to
Dorsheimer and Gibbons, who believed they were valid
and purchased them in good faith, and they sold them
to Woods, the defendant in error. The money paid
for the bonds went into the city treasury and was
used by the city. The bonds were held to be void,
and the suit was brought to recover the money which
was paid for them. In the discussion of that ques-
tion Mr. Chief Justice WAITE, in speaking for the full
court, on pages 298 and 299, used this language:

"That the bonds in question are invalid is con-
ceded. Such is the effect of Anthony v. County of
Jasper (101 U. S. 693), decided at the last term. It
is equally true that the legal effect of the transactions
by which the plaintiff and his assignors got possession
of the bonds was a borrowing by the city of the money
paid for what was supposed to be a purchase of the
bonds. As the broker through whom the business was
done was the agent of the city and acting as such,

the case, so far as the city is concerned, is the same as though the money had been paid directly into the city treasury and the bonds given back in exchange. The fact that the purchasers did not know for whom the broker was acting is, for all the purposes of the present inquiry, immaterial. They believed they were buying valid bonds which had been negotiated and were on the market, when in reality they were loaning money to the city, and got no bonds. The city was in the market as a borrower, and received the money in that character, notwithstanding the transaction assumed the form of a sale of its securities.

"The city, by putting the bonds out with a false date, represented that they were valid without registry. The bonds were bought and the price was paid under the belief, brought about by the conduct of the city, that they had been put out and had become valid commercial securities before the registry law went into effect. It would certainly be wrong to permit the city to repudiate the bonds and keep the money borrowed on their credit. The city could lawfully borrow. The objection goes only to the way it was done. As the purchasers were kept in ignorance of the facts which made the bonds invalid, they did not knowingly make themselves parties to any illegal transaction. They bought the bonds in open market, where they had been put by the city in the possession of one clothed with apparent authority to sell. The only party that has done any wrong is the city.

"In Moses v. Macferlan (2 Burr. 1005) it is stated as a rule of the common law, that an action 'lies for money paid by mistake, or upon a consideration which happens to fail, or for money got through imposition.' The present action can be sustained on either of these grounds. The money was paid for bonds apparently well executed, when in fact they were not, because of the false date they bore. This was clearly money

paid by mistake. The consideration on which the payment was made has failed, because the bonds were not, in fact, valid obligations of the city. And the money was got through imposition, because the city, with intent to deceive, pretended that the false date the bonds bore was the true one. While, therefore, the bonds cannot be enforced, because defectively executed, the money paid for them may be recovered back. As we took occasion to say in Marsh v. Fulton County (10 Wall. 676) 'the obligation to do justice rests upon all persons, natural or artificial, and if a county obtains the money or property of others without authority, the law, independent of any statute, will compel restitution or compensation.'

"It is argued, however, that, as the city was only authorized by law to borrow money at a rate of interest not exceeding ten per cent per annum, the money cannot be recovered back, because a sale of the bonds involved an obligation to pay interest beyond the limited rate, and the borrowing was, therefore, *ultra vires*. There was no actual sale of the bonds, because there were no valid bonds to sell. There was no express contract of borrowing and lending, and consequently no express contract to pay any rate of interest at all. The only contract actually entered into is the one the law implies from what was done, to-wit, that the city would, on demand, return the money paid to it by mistake, and, as the money was got under a form of obligation which was apparently good, that interest should be paid at the legal rate from the time the obligation was denied. That contract the plaintiffs seek to enforce in this action, and no other."

A much stronger case, as I conceive it to be, for the defendant, involving this same question, was presented to the Supreme Court of the United States in the case of Chapman v. County of Douglas, 107 U. S. 348. The facts were substantially as follows: On

March 5, 1859, Chapman, by general warranty deed, conveyed to Douglas county, Nebraska, a certain tract of land for a poor farm, for and in consideration of $8,000, of which $2,000 was paid in cash, and for the remainder gave its four promissory notes, secured by mortgage, and payable, respectively, in one, two, three and four years. Sometime thereafter, the Supreme Court of that State decided that by the purchase of lands for such a purpose, a county could not be bound to pay at any specified time the purchase money, or to secure it by mortgage upon the land, but was limited to a payment in cash and to the levy of an annual tax to create a fund wherewith to pay the residue. The notes remaining unpaid, Chapman filed a bill praying for a reconveyance and an accounting, or should the county elect to retain the lands, then for a decree for the value of them. In the discussion of that question the court, on pages 355 to 358, in speaking through Mr. Justice MATTHEWS, used this language:

"In the present case, however, it was not the understanding of the parties that the vendor should await the collection of taxes, as prescribed by the statute, for the payment of the purchase money, but, on the contrary, there was an agreement for payment in a definite time, without regard to the condition of the county treasury, and for security by way of notes and mortgages. The agreement, as we have assumed, so far as it relates to the time and mode of payment, is void; but the contract for the sale itself has been executed on the part of the vendor by the delivery of the deed, and his title at law has actually passed to the county. As the agreement between the parties has failed by reason of the legal disability of the county to perform its part, according to its conditions, the right of the vendor to rescind the contract and to a restitution of his title would seem to be as clear as it would be just, unless some valid reason to the contrary can be shown. As was said by this court in

Marsh v. Fulton County, 10 Wall. 676, 684, and repeated in Louisiana v. Wood, 102 U. S. 294, 'the obligation to do justice rests upon all persons, natural and artificial, and if a county obtains the money or property of others without authority, the law, independent of any statute, will compel restitution or compensation.' See also Miltenberger v. Cooke, 18 Wall. 421. The illegality in the contract related, not to its substance, but only to a specific mode of performance, and does not bring it within that class mentioned by Mr. Justice BRADLEY in Thomas v. City of Richmond, 12 Id. 349. The purchase itself, as we have seen, was expressly authorized. The agreement for definite times of payment and for security alone was not authorized. It was not illegal in the sense of being prohibited as an offense; the power in that form was simply withheld. The policy of the law extends no further than merely to defeat what it does not permit, and imposes upon the parties no penalty. It thus falls within the rule, as stated by Mr. Pollock, in his Principles of Contract, 264: 'When no penalty is imposed and the intention of the Legislature appears to be simply that the agreement is not to be enforced, then neither the agreement itself nor the performance of it is to be treated as unlawful for any purpose.' [Johnson v. Meeker, 1 Wis. 436.]

"The principle was applied in the case of Morville v. American Tract Society, 123 Mass. 129, 137, where it was said: 'The money of the plaintiff was taken and is still held by the defendant under an agreement which it is contended it had no power to make, and which, if it had power to make, it has wholly failed on its part to perform. It was money of the plaintiff, now in the possession of the defendant, which in equity and good conscience it ought now to pay over, and which may be recovered in an action for money had and received. The illegality is not that which arises where the contract is in violation of public policy or

of sound morals, and under which the law will give no aid to either party. The plaintiff himself is chargeable with no illegal act, and the corporation is the only one at fault in exceeding its corporate powers by making the express contract. The plaintiff is not seeking to enforce that contract, but only to recover his own money and prevent the defendant from unjustly retaining the benefit of its own illegal act. He is doing nothing which must be regarded as a necessary affirmance of an illegal act.'

"The decision of this court in Hitchcock v Galveston, 96 U. S. 341, 350, covers the very point. There a recovery was allowed for the value of the benefit conferred upon the municipal corporation, notwithstanding and, indeed, for the reason, that the contract to pay in bonds was held to be illegal and void. 'It matters not', said the court, ' that the promise was to pay in a manner not authorized by law. If payments cannot be made in bonds, because their issue is *ultra vires,* it would be sanctioning rank injustice to hold that payment need not be made at all. Such is not the law.'

"This doctrine was fully recognized by the Supreme Court of Nebraska as the law of that State in the case of Clark v. Saline county, 9 Neb. 516, in which it adopts, from the decision of the Supreme Court of California in Pimental v. City of San Francisco, 21 Cal. 362, the following language: 'The city is not exempted from the common obligation to do justice which binds individuals. Such obligation rests upon all persons, whether natural or artificial. If the city obtain the money of another by mistake, or without authority of law, it is her duty to refund it, from this general obligation. If she obtain other property which does not belong to her it is her duty to restore it, or if used to render an equivalent therefor, from the like obligation. [Argenti v. San Francisco, 16 Cal. 282.] The legal liability springs from the moral duty to make restitution.'

"The conveyance by Chapman to the county of Douglas passed the legal title, but upon a condition in the contract which it was impossible in law for the county to perform. There resulted, therefore, to the grantor the right to rescind the agreement upon which the deed was made, and thus to convert the county into a trustee, by construction of law, of the title for his benefit, according to the often repeated rule, as stated by Hill on Trustees, 144, that,'whenever the circum-·stances of a transaction are such that the person who takes the legal estate in property cannot also enjoy the beneficial interest, without necessarily violating some established principle of equity, the court will immediately raise a constructive trust and fasten it upon the conscience of the legal owner, so as to convert him into a trustee for the parties who, in equity, are entitled to the beneficial enjoyment'. Upon this principle the vendor of real estate is treated as trustee of the title for the purchaser; and the mortgagee, having the legal title, after payment of the mortgage debt, is a trustee for the mortgagor. The analogy is complete between these and every case, of which the present is one, where the holder of the legal title is under a duty to convey to another."

So in the case of Vanatta v. State Bank of Ohio, supra. In that case under the act under which the bank was incorporated it had no power to discount negotiable notes unless their negotiability was restricted to special indorsement. A branch bank thereof assumed to discount a negotiable promissory note without indorsing the restriction thereon. The court in that case held that while the bank could not recover upon the note, yet it was entitled to recover the money in an action on common count, and in so holding used this language: "The power of the bank to make such a contract of loan, without taking any written evidence of indebtedness, was unquestionable. The answer shows the transaction to have been, not the discounting

of a valid business note by a third party, but in fact a loan of money, evidenced by a note drawn in a form which the law prohibited, and which was void for want of power in the bank to receive it in that form. The substantial contract of the parties was untainted with usury, or any other illegality; the sole vice was in the negotiable form of the note. As commercial paper, this note was utterly void; the bank could maintain no action upon it; and the statute prohibited its assignment, even if valid, except for the use of the bank. We think the whole object of the requirement of the statute, as to the form of discounted paper, is accomplished, and indeed can only be attained, by holding that securities, taken in a prohibited form, are simply void, and do not affect the independent rights or liabilities of the parties. The mischief intended to be remedied is thus guarded against, whilst the bona-fide assets of the bank are preserved for the benefit of bill-holders and creditors. A party should not be permitted to plead his own violation of the law, as a discharge from legal obligation to pay an honest debt. The authorities are numerous, both in this country and in England, in support of the principle that money loaned on a written security which the statute makes void, may be recovered in an action on the common counts. Indeed, I am aware of no authority to the contrary, where the vice of the paper is merely in its form.''

The same question came before the Supreme Court of California; and it was held that where the plaintiff loaned money to a corporation which applied the same to its own use, he could recover it back in an action for money loaned, though the notes on which the loan was made were void because their execution was unauthorized; and that the notes, while not evidence of liability on the express contract appearing on the face thereof, were admissible for the purpose of showing that the money which they represented was furnished by plaintiff to defendant. [Pauly v. Pauly, 40 Pac. 29.]

In Bank of Missouri v. Scott, 1 Mo. 745, it was said: "On the second point the law is well settled, that where the plaintiff fails on the special count, upon the note or bill, from a defect in the count, misdescription of the instrument, failure in the proof, etc., he may in many, and indeed in most cases, supply the omission by the proof of the consideration, for which the note or bill was given, under the general count; but then the consideration must be adapted to the count, and money loaned cannot be given in evidence to support the count for money had and received."

In Marston v. Boynton, 47 Mass. 1. c. 129, it was said: "The court instructed the jury, first, to inquire whether the loan was made by the plaintiff to the defendants, on their credit; and there was evidence to warrant the jury in finding that it was so made. If it was, then, by operation of law, the defendants became bound to repay the money, and the note of Centre, received of them by the plaintiff, was merely collateral security."

In Aldrich v. Chemical National Bank, 176 U. S. 618, it was held: "A national bank which uses in its business money obtained by its vice-president as a loan to it from another national bank cannot escape liability to account therefor upon the ground that the loan was not negotiated by it or by its direction, or that it could not itself have legally borrowed the money."

In the case of Gwin v. Smur, 49 Mo. App. 361, defendant and his wife entered into a contract with plaintiff whereby they agreed to sell to him the wife's general property, and as a part of the consideration thereof the plaintiff paid defendant the sum of $500. The wife refused to convey the land to plaintiff, or to return the $500. In holding defendant liable for said money, the court, speaking through GILL, J., used this language:

"Said real estate contract was not only void and worthless as to Mrs. Smur, but as well invalid as to this defendant, her husband. It was a blank piece of paper, worthless for any purpose. [Gwin v. Smurr, 101 Mo. 550; Craig v. VanBebber, 100 Mo. 584; Brown v. Miller, 46 Mo. App. 1.]

"The mere statement of this case readily suggests its decision. Through the instrumentality of a worthless and void contract for the sale and conveyance of his wife's real estate, defendant Smur has obtained $500 from plaintiffs, which, in equity and good conscience, he ought to return. Smur holds that sum of money which he got possession of by means of a void, non-enforceable contract—therefore, without consideration; and as said by the Supreme Court 'plaintiffs have an undoubted right to recover this money in an action for money had and received.' [101 Mo. 553.]

"Since, then, the Smurs were not bound on said so-called contract, neither were the plaintiffs. The matter then set up in the answer constitutes no defense. The plaintiffs' right to this money, thus held by defendant Smur, cannot be defeated by reason of any supposed stipulation in said nugatory instrument."

For the purpose of showing more clearly the application of the principle of law announced in that case to the case at bar, we have rearranged the clauses quoted therefrom, but by so doing neither the sense nor meaning thereof has been changed.

The same principle involved in this case was involved in the case of Binion v. Browning, 26 Mo. 270. In that case Browning borrowed of Binion $120 for one year to enable him to enter a tract of land, and agreed to give the former a mortgage upon the land as soon as entered to secure the money; the land was entered, but defendant refused to give the mortgage as agreed. As the agreement to give the mortgage

was within the Statute of Frauds, and therefore void, plaintiff instituted a suit in assumpsit to recover the money so loaned to defendant. In the discussion of that case NAPTON, J., speaking for the court, on pages 271 and 272, used this language: "We think the plaintiff was entitled to his judgment. The contract for the mortgage was within the Statute of Frauds, and the promise of the plaintiff to wait twelve months was therefore without consideration. In McGowen v. West, 7 Mo. 569, it was held that, where a note was given in consideration of a parol contract to convey land, in a suit upon such note the defendant could not plead in bar that the consideration was the parol contract, because it was at the option of the plaintiff to insist on the statute or not, and his suit upon the note might be construed as a disclaimer of the protection of the statute, so far as he was concerned. If, therefore, the plaintiff, was not in fault, the defendant could not in this way rescind the contract. That case was not like this. Here the mutual promises form the consideration of the agreement. The plaintiff sues for his money, and the defendant insists on the promise of the plaintiff to wait twelve months, a promise manifestly given on consideration of the verbal promise of the defendant to secure the money by a mortgage. Apart from the inability of the plaintiff to enforce this promise, the time for its effectual performance had passed when ten or eleven months had elapsed after the entry of the land, and when the entire object of the conveyance as a security may have been defeated. The case of Barnes and others v. Wise, 3 Mon. 170, cited in the opinion of McGowen v. West, is an authority to show that under circumstances like the present the Statute of Frauds is available to the plaintiff and that his money was due immediately. The plaintiff did not repudiate the contract, but the defendant has. The fact that no specific day was

fixed for making the mortgage is immaterial. As security was the object of the plaintiff and the consideration for his agreement to give time, it was the obvious meaning of both parties that the mortgage should be given when the land was purchased. The judgment of the circuit court will be reversed and a judgment will be entered here for the debt and interest.''

We have cited and quoted somewhat extensively from a few of the many cases found in this country and in England bearing upon the question of the right of a party to sue for and recover money paid or loaned to another upon a void contract; and the rule announced by all of them seems to be that where a void contract has been entered into, and that by means thereof money or other valuable thing has been parted with by one party thereto, and received and accepted by the other party thereto, and where the latter repudiates the contract and refuses to return the money or such other valuable thing, then the law will imply an agreement on the part of the recipient to return the same to the other party; and if he fails to do so, then the injured party may maintain an appropriate action against the offending party for the recovery of the money, or for the value of the thing so retained. That implied promise or agreement springs from the general moral obligation resting upon all persons and corporations to do equity and justice in all such transactions. To hold otherwise would be sanctioning the rankest injustice, and thereby take the money or property from one party and give it to another without compensation, and against the intention of both parties, as manifested by the void contract. Of course this rule should not and does not apply where its enforcement would violate some statute or other principle of law which prohibits the doing of the very thing the enforcement

of the rule would accomplish. The courts have improvised this rule by which right and justice may be worked out to the parties thereto, and not for the purpose of enabling them to avoid the law, and do indirectly that which the law will not permit them to do directly.

We have just been called upon to consider and pass upon the latter question in the case of Seaman v. Cap-Au-Gris Levee District; the opinion in which will be handed down with this. [219 Mo. 1.]

In that case, the plaintiff, one of the commissioners of the district, entered into a contract with the other commissioners in violation of an express statute to act as engineer of the district, in the construction of the drainage system ordered constructed in the district; and after serving in that capacity, other commissioners were appointed, and they refused to pay plaintiff for his services. Thereupon, he sued the district therefor, and relied upon the rule contended for in this case as authority for his right to recover in that case. We denied his right of recovery for the reason before suggested. To have permitted a recovery in that case under the rule here contended for would have operated in setting aside and nullifying the statute in that case, which expressly prohibited him from being so employed.

But that is not this case. Here the Middleton Bank was not prohibited by statute or other law from borrowing the money sued for. The statute interposed in this case simply went to the prevention of the execution of the note by the cashier, and for that reason a suit could not be maintained upon the note.

Counsel for appellant do not controvert the soundness of the rule of law contended for by respondent in this case, but expressly recognize its existence by this language, contained in their brief filed herein, to-wit: "There are cases which respondent will doubtless cite, which hold that a party cannot ques-

tion the validity of an act done without authority, without restoring the money or property received under such act. The law is, however, not applicable to this case for the reasons;

"(a). There is no evidence that the Middleton Bank received any money upon the note sued upon, nor upon the two notes previously given."

If that contention was true in point of fact, then, unquestionably, respondent would not be entitled to a recovery in this case, for the reason that the very foundation of respondent's claim rests upon the contention that appellant obtained $10,000 of its money under a void contract; that it repudiates the same and refuses to return the money so received, and that the only remaining remedy available to it is the enforcement of this rule.

In our judgment this record does not sustain the contention of appellant to the effect that it did not receive the proceeds of the note executed by Lewis to respondent on May 7, 1904. Mr. Neal, the vice-president of respondent bank, testified without objection that the proceeds of the note, less the discount, were placed on its books to the credit of the Middleton Bank, and that the latter drew it out on drafts, in the ordinary course of business. But counsel for the first time here raises the objection to this evidence that it is secondary and not the best evidence, and for that reason it should be disregarded. Whatever merit there might have been in that objection, had it been timely raised in the trial court, was completely waived by appellant's failure to make it there when the testimony was offered. That ancient rule of evidence is too well settled to require the citation of authorities to support it. [Rothwell v. Jamison, 147 Mo. 601.]

But independent of that, we are of the opinion that the testimony of Neal was properly admitted,

even though timely objection had been made to its admission. If the books of the bank and the drafts which were drawn against the account had been produced and admitted in evidence, they could have been corroborated, explained or contradicted by parol testimony. They do not stand upon the same footing with written contracts signed by the parties thereto. The latter cannot be contradicted, altered, added to, enlarged or changed by parol evidence. While the books of the bank and the drafts would have been admissible in evidence had their correctness first been proven, their admission would not have excluded any other competent testimony tending to prove or disprove the facts to which they related.

IV. The form of the judgment is erroneous in this case in that it directed execution to be "levied out of the assets in the hands of the receiver." The respondent has no priority over the other creditors of the Middleton Bank, but stands upon an equal footing with them; and this judgment must be paid pro rata with the claims of its other creditors. [Harding v. Nettleton, 86 Mo. 658; Smith v. Railroad, 151 Mo. 391.]

There are several other minor questions presented and argued by counsel for appellant, but as they are subordinate to those herein disposed of, no wise purpose would be served by prolonging this opinion by their discussion.

We, therefore, reverse the judgment, and remand the cause to the circuit court, with directions to enter judgment for respondent for the sum sued for, with six per cent interest, to be paid pro rata by the receiver with the other claims allowed against said bank.

All concur, except *Graves, J.,* who dissents.

## DISSENTING OPINION.

GRAVES, J.—I do not concur in the opinion of our Brother Woodson in this case and for several reasons.

I. It is now practically conceded that if this be an action on the note the plaintiff failed in the trial, *nisi*. No contention is now seriously made by counsel that the plaintiff can recover upon the note, although the first brief filed herein was not to this effect. In the first brief learned counsel took the position that a bank cashier by virtue of his office had the power to not only borrow money but also to execute a note therefor. They had overlooked the damaging statute in the case and were drawing their pleadings *on the note*, having in view another statute, which they quote. They say in the first brief:

"It will be noticed that the statute does not undertake to deprive a cashier of the right, power and authority to borrow money on behalf of his bank, nor to deprive him of the right, power and authority to execute promissory notes in its name and behalf. It only goes so far as to restrict or limit his right and power to 'indorse, sell, pledge or hypothecate any notes, bonds or other obligations received by said corporation for money loaned.'"

"That the cashier of a bank, by virtue of his office, has the right, power and authority to borrow money on behalf of his bank, *also to execute promissory notes* in its name and behalf, is well established, as we shall now show."

Counsel had in view section 1294, Revised Statutes 1899, and overlooked section 1281 preceding, which section we discuss later. Just a few words more, however, on the pleadings before the discussion of this statute. Whilst pleadings under our statute, Revised Statutes 1899, section 629, should be liberally construed, but in our liberality we should not permit

counsel to change their cause of action at the last moment in this court. To our mind this petition is one upon the note and not otherwise. The intent of the pleader and the character of the pleading should be drawn from the four corners of the instrument as said in the principal opinion, but we must not overlook the middle. We must take the instrument as a whole. The pleaders in this case realized that they could not recover upon the last note given, the one sued upon, without showing that it had been issued with the consent of the directors of the defunct bank. They realized that they had no such consent for that note, so as a matter of inducement they go back and pleaded the first note and all subsequent renewals, and this for the purpose of tracing consent to the last note. They had the letter of Lewis, the cashier, evidently false, that consent had been given to the issuance of the first note and undertook to trace that consent through to the note sued upon. So that we say all statements as to the notes previous to the one sued upon were matters of inducement. Then going to the last note, why allege its terms and why file a certified copy of it with the petition, if counsel for a moment thought they were suing for money loaned? The answer is evident. Counsel knew and believed that they were suing upon a note, and knew that when they sued upon such an instrument, they, under the law, had to file the note itself or a certified copy thereof. If suing for money loaned, why introduce the note in evidence, as was done? If suing for money loaned, why sue for $10,000, when at most Neal, the officer of plaintiff, only claims to have deposited the proceeds, after bank discount, of a $10,000 note, to the Middleton Bank? Their acts bespeaks the intent and belief of counsel much more than do their words by way of argument in this court. Again, why all this verbose pleading if counsel were suing for money loaned, or money had and received?

Why plead the time when due as expressed in the note? Why ask judgment for the eight per cent interest, as expressed in the note? That the distinguished and able counsel for the plaintiff thought they were declaring upon the note is earmarked throughout this case, until the last brief herein, wherein appears for the first time a change of front. Throughout the whole case *nisi* counsel for plaintiff tried this case upon the theory of having sued upon a note, and not until the last brief filed in this case did they make a change of front. How often has this court said that the theory below must be the theory here? We leave the majority opinion to answer.

We are of opinion that this petition is one upon the note and not one for money loaned, and so believing we think the case should be reversed outright.

II. Under section 1281, Revised Statutes 1899, among other things it is provided: "The board of directors of each and every bank organized under this article shall meet at least once per month and pass upon the business of the bank back to the previous meeting of the board, and shall keep a written record of its approval or disapproval of each and every loan, and at each monthly meeting the records shall show the aggregate of the then existing indebtedness and liability of each of the directors and officers to the bank, *and no bills payable shall be made and no bills shall be rediscounted by the bank except with the consent of the board of directors.*"

By section 1294, it is, among other things, provided: "The directors may appoint and remove any cashier or other employee at pleasure. The cashier or any other employee shall have no power to indorse, sell, pledge or hypothecate any notes, bonds, or other obligations received by said corporation for money loaned, until such power and authority shall have been

given such cashier or employee by the board of directors, in a regular meeting of the board, a written record of which proceeding shall first have been made, . . . and all acts of indorsing, selling, pleading and hypothecating done by said cashier or other officer or employee of said bank, without the authority from the board of directors, shall be null and void.''

Section 1281, Revised Statutes 1899, was a substitute for section 2748, Revised Statutes 1889, and section 1294, Revised Statutes 1899, was a substitute for section 2759, Revised Statutes 1889. The change was made in 1897, Laws 1897, p. 87, at which time sections 2748 and 2759 of the statutes were repealed and new sections enacted in lieu thereof. Slight changes were further made two years later in the revision of 1899.

Prior to 1897 no prohibitions or restrictions were placed upon the cashier. He possessed all the powers ordinarily understood to belong to such officer. There were no restrictions in either of the old sections. No records were required to be kept of loans and other things as now required. Directors were not required to meet and pass upon loans and to give their consent to the making of loans or borrowing of money as now required. These statutes clearly imply that the consent of the board of directors must be spread upon the records of the bank. They are required to meet monthly and to keep records. But whether the consent should be made to appear in one way or the other is not material in this case, because consent to the execution of this note or the borrowing of this money was not shown in any manner. By these statutes the cashier of a bank is the bank's agent with limited powers. The limits are placed upon the powers of the agent by public statute, and all persons dealing with such agent must deal with him at his peril and unless the express power be shown for the

200 Sup—37

act, it is of no binding effect.  One dealing with an agent of limited powers must affirmatively show that the act relied upon fell within his powers.  This plaintiff failed to do.  Need we cite cases to a proposition so well founded?

These statutes were passed to prevent a cashier from looting banks by borrowing money.  Under his general powers such cashier by statute is given the right to buy and sell exchange.  If these statutes are meaningless, as my brothers seem to indicate, then all a cashier of a bank has to do to loot the bank is to borrow money otherwise than by note, put it with a correspondent bank and sell exchange to himself, and thus loot the bank.  These laws were to prevent such conduct.  The usual and customary method of procuring money by way of loan is by giving a bill-payable.  The giving of such a bill by the cashier without the consent of the directors is prohibited. To say that the cashier can borrow money without a note, but can't borrow it with a note is trifling with the statute law and its purpose.  It would be the height of legislative foolishness to pass a law intended to prohibit a cashier from borrowing money on the bank's note and yet permit him without reserve to borrow without giving the note.  The legislative meaning and intent of this law was to prohibit the borrowing of money by the cashier in the name of the bank except upon the consent of the board of directors. The law was not only intended to protect the bank itself but likewise its depositors.

Nor is there injustice in saying that an individual or bank loaning money on a note thus executed without authority should lose it.  They know the law. They know the limits on the powers of the agent, the cashier.  Dealing with such agent of limited powers, they must know his right to make and receive a loan at their peril.  Many harsher statutes than this are unhesitatingly enforced by the courts.

If for increased interest rates by way of discounts, banks or individuals will chance the authority of the limited agent to make the loan, they must do so with the penalties affixed by law.

The opinion of my Brother WOODSON mops both of these statutes off of the books with one fell swoop. Cases wherein there are no such statutes, and cases in this State, and such there are, discussing the powers of a bank cashier, prior to the Act of 1897, can have no binding effect. The purpose of these statutes was to prevent the cashier "by virtue of his office" from borrowing money. It is a wise legislative act, remedial in character, and should be upheld. We are of opinion that even on the theory that the plaintiff is suing for money loaned, it has failed to show that the agent of limited powers had the authority to make the loan, and therefore has failed to make its case.

III. But going further, and even conceding, which we do not do, that the plaintiff could recover for money loaned, and that this is such an action, yet it devolves upon plaintiff to prove by competent evidence that the defunct bank actually received that money, and this in our judgment it has failed to do. There is no pretense that this money was sent direct to the defunct Middleton Bank. There is no pretense that it was delivered to an authorized agent of such bank. It was, as the witness says, who does not speak from personal knowledge, but from an alleged examination of books and the customs of the bank, deposited in plaintiff bank to the credit of the Middleton Bank, and afterwards paid out on drafts. Objections were urged to this evidence but ignored. No pretense is made to put in evidence either the books of plaintiff bank or the books of the Middleton Bank. No effort is shown to get the alleged drafts of the Middleton Bank upon which the plaintiff claims that it paid the money. Some of these drafts

it claims to have in its own possession, and yet the witness is permitted to orally allege payment, when the written evidence is in existence, if there ever was such written evidence. This proof that the Middleton Bank was the beneficiary of this fund is not sufficient to take this lump sum of $10,000 from the bona-fide creditors of the defunct bank, to whom it rightfully belongs. By bona-fide creditors, we mean those creditors who have become such in the usual channels of business, and not such creditors as is the plaintiff, which became a creditor, if it is either in fact or law a creditor, by knowingly violating a public statute. So that upon any theory of this case, there has not been that degree of cogent and competent proof to authorize this verdict.

We therefore insist that this cause should be reversed.